**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

ZURICH AMERICAN INSURANCE, ET
AL.,

     Plaintiffs,

         v.

LORD ELECTRIC CO. OF PUERTO
RICO, ET AL.,

     Defendants.

**Civil No. 09-1111 (SEC)**

**OPINION AND ORDER**

    Before the Court are third-party plaintiff's and the third-party defendant's cross-motions for summary judgment (Dockets # 340 & 425), and the parties' respective responses and reply memoranda. Dockets # 425, 433, 444.  Also pending are third-party defendant's motion under Rule 56(d) (Docket # 382), the third-party plaintiff's opposition thereto (Docket # 395), and their respective replies. Dockets # 409 & 415. After reviewing the filings and applicable law, all of third-party defendant's motions are **DENIED**, while the third-party plaintiff's motion for summary judgment is **GRANTED in part and DENIED in part**.

    **Factual and Procedural Background**

    The present instance is the latest saga of this protracted litigation, which concerns a diesel fuel spill at American International Plaza (AI Plaza), an office building in San Juan, Puerto Rico. The background facts of this case are recounted in prior, published opinions. See Zurich Am. Ins. v. Lord Elec. Co. of P.R., 828 F.Supp.2d 462 (D.P.R. 2011); Wells Real Estate Inv. Trust II, Inc. v. Chardon/Hato Rey P'ship, S.E., 615 F.3d 45, 47 (1st Cir. 2010). Assuming familiarity with those opinions, the Court recites only the facts necessary to resolve the untimely dispute between third-party plaintiff Alarm & Control System Co. (Acotrol), and its insurer, third-party defendant Real Legacy Assurance Company (Real Legacy). Their quarrel boils down

to whether or not the insurance policy Real Legacy issued to Acotrol obliges it to defend and indemnify Acotrol in the underlying tort suit filed against the latter. Based on the insurance policy's total pollution exclusion clause, Real Legacy has denied coverage, and has refused to continue defending Acotrol from the underlying suit.

I

At all times relevant to the events giving rise to this suit (i.e., February 2008), Acotrol was covered by a commercial general liability (CGL) insurance policy issued by Real Legacy.[1] The policy obliged Real Legacy to defend and indemnify Acotrol for property damage and bodily injuries caused by Acotrol in the course of its business, see Docket # 425-2, p. 52, but contained a total pollution exclusion providing that:

> This insurance does not apply to . . . "[b]odily injury" or "property damage" which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time. . . .

> Pollutants means any solid, liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed.

Id., p. 65.

II.

The facts leading up to the AI Plaza spill are neatly summarized by the First Circuit:

> Prior to closing, the transformer for AI Plaza's main electrical service failed on February 10, 2008, and the building's two diesel-powered back-up generators began operating. Late on February 11 or early on February 12, a large diesel fuel spill occurred. [F]uel spilled from the maintenance room on the building's top floor into other parts of the building. As a result of the spill, AI Plaza required significant remediation, repair, cleaning and restoration, and its tenants were

---

[1]Real Legacy also issued an umbrella policy to Acotrol. Docket # 425-3. But this umbrella policy, which contains identical terms and exclusions, is of no moment. After all, "the purpose of an umbrella policy is to provide coverage for losses in excess of the limits of liability of underlying policies." Barrett Paving Materials, Inc. v. Cont'l Ins. Co., 488 F.3d 59, 67 (1st Cir. 2007). For ease of analysis, then, the Court will collectively refer to both policies as "CGL policy."

1

2

forced to vacate the building. Chardón obtained the necessary clearances to reopen the building for occupancy on March 26, and the majority of tenants returned by the end of May.

3

4

Wells Real Estate Inv. Trust II, Inc., 615 F.3d at 48. This diversity tort suit under Article 1802,

5

P.R. Laws Ann. tit. 31, § 5141, ensued. Docket # 1. In it, the plaintiffs seek to recoup from the

6

alleged tortfeasors the damages caused to their properties and businesses. See generally id.

7

Third-party plaintiff Acotrol, a company that provides services related to the installation

8

and maintenance of alarm systems, see Docket # 433-5, was named as a defendant. Docket #

9

1, ¶ 18. The plaintiffs contend, essentially, that Acotrol failed to install, inspect, or otherwise

10

maintain the alarm systems that malfunctioned. Id. ¶¶ 18-19, 78. Acotrol promptly referred the

11

complaint to Real Legacy for defense and coverage. Although Real Legacy assigned defense

12

counsel to represent Acotrol, it had also sent (in July 2008) a reservation-of-rights letter citing

13

the total pollution exclusions contained in the CGL policy. Docket # 439-1.[2]

14

Then, in July 2009, the attorney assigned by Real Legacy filed an appearance and

15

answered the underlying complaint on behalf of Acotrol. Dockets # 11, 17, 28. Since then Real

16

Legacy, as the entity controlling and paying for the legal defense of Acotrol, has (1) been kept

17

apprised of the proceedings in this case; (2) authorized the retention of an expert witness on

18

behalf of Acotrol, see Dockets  # 312 & 343-6; (3) filed a third-party complaint, Docket #134;

19

and (4) even authorized the participation of its insured and its designated legal representative

20

in the court-annexed mediation proceedings, see, e.g., Docket # 273.

21

But on December 19, 2012 — over three years since Real Legacy assigned counsel to

22

represent, while the mediation proceedings and discovery were still ongoing, and before

23

Acotrol's retained expert submitted a rebuttal report, see Docket # 312  — Real Legacy

24

_____

25

[2]A reservation-of-rights letter is "[a] notice of an insurer's intention not to waive its contractual rights to contest coverage or to apply an exclusion that negates an insured's claims."  Black's Law Dictionary 1422 (9th ed. 2009) .

26

unilaterally withdrew legal defense and denied coverage. That day, a Real Legacy representative sent a letter to Acotrol's president, notifying him that it was denying coverage and withdrawing defense. Docket # 342-4. Real Legacy explained that, after conducting an "investigation" (more on this later) and receiving the report submitted by plaintiffs' expert witness, it determined that the total pollution and professional liability exclusions barred coverage. Id., pp. 1-2. In its letter, Real Legacy gave full faith and credit (citing verbatim) each and every one of the alleged findings asserted against Acotrol in the report submitted by plaintiffs' expert. See id. The letter, however, contained no information whatsoever regarding the "investigation" Real Legacy says it conducted. See id.[3]

### III.

After successfully securing leave of court, Acotrol filed a third-party complaint, see Fed. R. Civ. P. 14, against Real Legacy. Docket # 339. Seeking a declaratory judgment, see 28 U.S.C. § 2201(a), Acotrol "requests a determination as the propriety of Real Legacy's belated denial and withdrawal of legal defense and coverage; and the breach of the insurance contract . . . ." Docket # 339, ¶ 3.1. Acotrol then moved for summary judgment, requesting a declaration that Real Legacy (1) owes defense and coverage to Acotrol; and (2) breached its duties to Acotrol when it withdrew defense and denied coverage. On May 29, 2013, Real Legacy was

---

[3]Under these circumstances, Real Legacy's behavior of outright withdrawing legal representation and denying coverage after more than three years — without even bothering to first secure declaratory relief in its favor — raises eyebrows. See generally Tibbs v. Great Am. Ins. Co., 755 F.2d 1370, 1374 (9th Cir. 1985); Event Producers, Inc. v. Tyser & Co., 854 F. Supp. 35 (D.P.R. 1993), aff'd sub nom. Event Producers, Inc. v. Tyser & Co. N. Am., Inc., 37 F.3d 1484 (1st Cir. 1994). Puerto Rico law makes clear that an insurer must "implement reasonable methods for the expeditious investigation of claims which may arise from the terms of a policy." P.R. Laws Ann. tit. 26, § 2716a(3). In this vein, it provides that "[t]he investigation, adjustment, and resolution of any claim shall be made in the shortest reasonable period of time within the first ninety (90) days after said claim ha[s] been submitted to the insurer." § 2716b(1). In the event that an insurer is unable to resolve a claim within 90 days, it must "maintain in its records any documents attesting to the existence of a just cause to exceed the term previously provided." § 2716b(2). Real Legacy would do well to keep these legal precepts in mind in going forward with this case.

duly served with a copy of the third-party complaint and the summary-judgment motion. Docket # 353.

After failing to sever Acotrol's third-party complaint, see Docket # 379, on July 12, 2013, Real Legacy filed its answer thereto. Docket # 380.[4] After several procedural nuances, Real Legacy opposed Acotrol's motion for summary judgment and moved for summary judgment, seeking a declaratory judgment in its favor. Docket # 425, p. 2. Contending that it "does not owe any duty towards its insured," Real Legacy maintains the policy "does not cover the allegations of the Complaint . . . pursuant to its terms, conditions and exclusions." Id., p. 2.

A preliminary ruling is in order. Procedurally speaking, Real Legacy is not entitled to a declaratory judgment in its favor. That is so because "it did not file a counterclaim seeking affirmative relief." Vermont Mut. Ins. Co. v. Zamsky, No. 11-11869, 2012 WL 6864702, at * 1 (D. Mass. Dec. 17, 2012), report and recommendation adopted (Jan. 11, 2013); see Missouri, K. & T. Ry. Co. v. Early, 74 F.R.D. 60, 61 (E.D. Okla. 1977) (holding that affirmative relief in the form of declaratory judgments was improperly requested in the answers, and should have been sought by counterclaim). The upshot is that Real Legacy is "only entitled to a ruling by the Court denying . . . [Acotrol's] prayer for a declaratory judgment; . . . [Real Legacy is] not entitled to a declaratory judgment in . . . [ its] favor." Vermont Mut. Ins. Co., 2012 WL 6864702, at * 1.[5]

---

[4] Real Legacy, however, failed to file a counterclaim, see Fed. R. Civ. P. 13, seeking affirmative relief.

[5] For the reasons laid out below, however, even if Real Legacy's request for declaratory judgment were properly before the Court, the same conclusion would follow: Real Legacy is not entitled to declaratory judgment in its favor. Accordingly, because the same result would obtain, the Court entertains in the alternative Real Legacy's declaratory-judgment request.

**Standard of Review**

The Court may grant a motion for summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Kelley v. Correctional Medical Services, Inc., 707 F.3d 108, 155 (1st Cir. 2013). At this stage, it is axiomatic that courts "may not weigh the evidence," Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 42 F.3d 668 (1st Cir. 1994), but must construe the record in the "light most flattering" to the nonmovant. Soto-Padro v. Public Bldgs. Authority, 675 F.3d 1 (1st Cir. 2012). Courts must similarly resolve all reasonable inferences in favor of the party opposing summary judgment. Id.

Because the summary judgment inquiry is grounded in the factual evidence available, one of its principal purposes "is to isolate and dispose of factually unsupported claims or defenses." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The Court may therefore consider "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(A). Inadmissible evidence, such as hearsay evidence considered for the truth of the matter asserted, is excluded at this stage. Hannon v. Beard, 645 F.3d 45, 49 (1st Cir. 2011).

Once the party moving for summary judgment has established an absence of material facts in dispute, and that judgment is proper as a matter of law, the burden shifts to the nonmovant to "affirmatively point to specific facts that demonstrate the existence of an authentic dispute." Kenney v. Floyd, 700 F.3d 604, 608 (1st Cir. 2012) (internal quotation marks omitted). A dispute is genuine if a reasonable factfinder "could resolve the point in favor of the non-moving party." Johnson v. Univ. of P.R., 714 F.3d 48, 52 (1st Cir. 2013) (internal quotation marks omitted). A material fact, in turn, is one that may affect the outcome of the suit under the governing law. Maymí v. P.R. Ports Auth., 515 F.3d 20, 25 (1st Cir. 2008). The nonmovant may

not rest on conclusory allegations and improbable inferences. Shafmaster v. U.S., 707 F.3d 130, 135 (1st Cir. 2013); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). Neither "effusive rhetoric," Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997) nor "arguments woven from the gossamer strands of speculation and surmise," RTR Technologies, Inc. v. Helming, 707 F.3d 84, 93 (1st Cir. 2013), suffice to forestall the entry of summary judgment. So the nonmovant must "point to competent evidence and specific facts to stave off summary judgment." Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011). Failure to shoulder this burden, "allows the summary judgment engine to operate at full throttle." Lawton v. State Mut. Life Assur. Co., 101 F.3d 218, 223 (1st Cir. 1996).

Cross-motions for summary judgment do not upend the summary judgment standard; they simply require courts to determine "whether either of the parties deserves judgment as a matter of law on facts that are not disputed . . . ." Fidelity Co-op. Bank v. Nova Cas. Co., 726 F.3d 31, 36 (1st Cir. 2013) (quoting Barnes v. Fleet Nat'l Bank, N.A., 370 F.3d 164, 170 (1st Cir. 2004)).

**Applicable Law and Analysis**

Real Legacy does not challenge Acotrol's assertion that the damages described in the underlying complaint fall within the CGL policy's grant of coverage for property damage. Instead, Real Legacy argues that the pollution exclusion removes coverage for those harms. The heart of the dispute, then, is whether the movement of diesel from a building's top floor into other parts of the building constitutes "discharge, dispersal, seepage, migration, release or

escape" within the terms of the CGL policy's total pollution exclusion.[6] In confronting this question, the Court takes note of several bedrock principles.

The construction of an insurance policy is a question of law, e.g., Nieves v. Intercontinental Life Ins. Co., 964 F.2d 60, 63 (1st Cir. 1992), which in this diversity action, is supplied by Puerto Rico law. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). So the Court interprets the CGL policy in accordance with the laws of Puerto Rico, e.g., Vázquez-Filippetti v. Cooperativa de Seguros Múltiples de Puerto Rico, 723 F.3d 24, 29 (1st Cir. 2013), which provide in pertinent part that "[e]very insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy." P.R. Laws Ann. tit. 26, § 1125. Absent an ambiguity, courts must interpret the insurance contract according to its "plain meaning, as a whole, and in harmony with the general purposes of the policy." Jewelers Mut. Ins. Co. v. N. Barquet, Inc., 410 F.3d 2, 16 (1st Cir. 2005). "If the wording of the contract is explicit and its language is clear, its terms and conditions are binding on the parties," Nieves, 964 F.2d at 63, but  if the policy's  language is cloudy, courts "must construe the provisions against the insurer." López & Medina Corp. v. Marsh USA, Inc., 667 F.3d 58, 64 (1st Cir. 2012) (quoting Great Am. Ins. Co. v. Riso, Inc., 479 F.3d 158, 162 (1st Cir. 2007)). Importantly, courts shall also "deem ambiguity present in a policy if a word or phrase is reasonably susceptible to more than one construction." Id.[7]

---

[6] The Court assumes — without deciding — that the diesel in question falls under the definition of "pollutant" within the meaning of the CGL policy's total pollution exclusion clause. But see Montana Petroleum Tank Release Comp. Bd. v. Crumleys, Inc., 341 Mont. 33, 45 (2008) (concluding that "most consumers would consider diesel a pollutant when it leaks into the ground and contaminates soil and groundwater.") (emphasis added).

[7] See also, e.g., Great Am. Ins., 479 F.3d at 163 ("The ambiguities canon applies only where the policy can reasonably be read two ways, and the touchstone of coverage is expectation of protective insurance reasonably generated by the terms of the policy." (internal quotation marks and citation omitted)); Pagan Caraballo v. Silva, Ortiz, 22 P.R. Offic. Trans. 96, 101 (1988) (noting that insurance contracts "should be generally understood within their most common and usual meaning, not paying

The above mandate is in line with another fundamental canon of interpretation: Insurance contracts generally are viewed as adhesion contracts under Puerto Rico law. E.g., Daniels-Recio v. Hosp. Del Maestro, 109 F.3d 88, 91 (1st Cir. 1997). This means that such contracts require liberal construction in favor of the insured. Fajardo Shopping Ctr., S.E. v. Sun Alliance Ins. Co. of P.R., Inc., 167 F.3d 1, 7 (1st Cir. 1999). That is not to say, of course, that "[t]he mere fact that a contract is one of adhesion . . . render[s] it per se unenforceable . . . ." Rivera v. Centro Médico de Turabo, Inc., 575 F.3d 10, 19 (1st Cir. 2009).

I.    *Duty to Defend*

An insurer's duty to defend, which, as later explained, is different from its duty to indemnify, "is measured by the allegations in a  plaintiff's complaint—if any of these allegations, read liberally, state facts that would be covered by a liability policy if proven true, then the insurer must provide a defense for the insured defendant." Jewelers Mut. Ins. Co., 410 F.3d at 15-16 (construing Puerto Rico law). "The court should examine all the allegations made by the plaintiff and, based on a joint interpretation of the same, determine whether there is a possibility that the insured is protected by the policy issued in his favor." Pagán Caraballo v. Silva, Ortiz, 22 P.R. Offic. Trans. 96, 102 (1988) (collecting case law on this point). "Any doubt as to whether there is a duty to defend must be solved in the insured's favor." Id. at 103 (citations omitted).

A.    *Total Pollution Exclusion*

Because the purpose of insurance contracts is to indemnify and protect the insured, the Puerto Rico Supreme Court has mandated that exclusionary clauses — "not usually favored," Quinones Lopez v. Manzano Pozas, 1996 P.R.-Eng. 499, 244 (1996) —   must be interpreted restrictively, "and only enforce them where their applicability to the case at hand is clear."

_____

much attention to grammatical rigour, but to the general use and popular meaning of the idioms").

Jewelers Mut. Ins. Co., 410 F.3d at 16 (citing Puerto Rico case law). Accordingly, any doubts about their applicability "must be strictly construed against the insurer," Rivera v. Insurance Co. of P.R., 3 P.R. Offic. Trans. 128, 131-32 (1974), and the burden  to prove the exclusion's applicability lies squarely with the insurer. See Fajardo Shopping Ctr., S.E. v. Sun Alliance Ins. Co. of Puerto Rico, Inc., 999 F. Supp. 213, 224 (D.P.R. 1998) aff'd, 167 F.3d 1 (1st Cir. 1999); accord, e.g., Nascimento v. Preferred Mut. Ins. Co., 513 F.3d 273, 277 (1st Cir. 2008).

Moving from the general to the specific, it would be an understatement to say that total pollution exclusions in insurance policies have provoked a good deal of litigation. See Apana v. TIG Ins. Co., 574 F.3d 679, 682 (9th Cir. 2009) (Kozinski, C.J.); see also Scottsdale Indem. Co. v. Vill. of Crestwood, 673 F.3d 715, 718 (7th Cir. 2012) (Posner, J.) (providing historical overview of total pollution exclusions). As relevant here, courts have reached divergent interpretations regarding the meaning of the terms "discharge, dispersal seepage, migration, release or escape." See Meridian Mut. Ins. Co. v. Kellman, 197 F.3d 1178, 1181 (6th Cir. 1999) (collecting split). Suffice it to say that "these methods of travel requirements have been both narrowly and broadly construed by various jurisdictions, usually depending upon whether that jurisdiction views pollution as limited to traditional industrial environmental pollution or not." 9 Couch on Insurance § 127:9 (3d. ed. updated June 2013). Such disagreements abound. Compare, e.g., Nautilus Ins. Co. v. Jabar, 188 F.3d 27, 31 (1st Cir. 1999) (applying Maine law and "agree[ing] with those courts which have restricted the exclusion's scope to only those hazards traditionally associated with environmental pollution") with, e.g., Noble Energy, Inc. v. Bituminous Cas. Co., 529 F.3d 642, 649 (5th Cir. 2008)  (applying Texas law and holding that "substances need not be released into the surrounding environment to qualify as pollutants for purposes of a pollution exclusion clause") (emphasis omitted).

Luckily, the Puerto Rico Supreme Court has taken a stance, relieving the Court from embarking on a so-called "Erie prediction." See, e.g., Candelario Del Moral v. UBS Fin. Servs.

Inc. of Puerto Rico, 699 F.3d 93, 98 (1st Cir. 2012). And unfortunately for Real Legacy, it has sided with those jurisdictions that view pollution as limited to traditional, environmental pollution. Interpreting the exact terms at issue here — "discharge, dispersal, seepage, migration, release or escape" — the court in Molina v. Plaza Acuatica, 166 P.R. Dec. 260, 276 (2005) (certified translation provided at Docket # 414-1, p. 11) unequivocally held that "the total pollution liability exclusion clauses apply only to environmental pollution events as this concept is commonly understood." (Emphasis added.)

The facts in Molina are "simple," 166 P.R. Dec. 260 at 262 (certified translation, p. 3). There, "several persons" were poisoned while "utilizing" one of Plaza Acuatica's swimming pools. Id. (certified translation, p. 4). So they filed a tort action against Plaza Acuatica (a pool-oriented recreational center), alleging that their poisoning was caused by "an escape of hydrochloric acid and sodium hypochlorite" —  "two chemicals which are commonly utilized to purify the waters of . . . commercial swimming pools . . . ." Id. Contending that the insurance policy's total pollution clause barred coverage, Plaza Acuatica's insurer refused to defend and provide coverage. The Puerto Rico Supreme Court disagreed with the insurer, concluding that, although the incident was indeed a "contamination event," id. at 8, it was not an environmental pollution event "as this concept is commonly understood," id. at 11.[8] "In view of the fact that the event . . . in this case was circumscribed to the 'wave pool' and its surroundings area, and that the agent involved in the incident is one routinely utilized in the appellant's business," the court further held, "the total pollution liability exclusion clauses d[id] not apply to the events in this case." Id. After all, the court reasoned, Plaza Acuatica could "not suppose that the policy

_____

[8] Accord Motorists Mut. Ins. Co. v. RSJ, Inc., 926 S.W.2d 679, 682 (Ky.Ct.App.1996) (finding that the pollution exclusion was ambiguous because "historical perspective and the continued use of environmental law terminology" signaled an intent that it apply only to environmental catastrophes); Morton Int'l, Inc. v. Gen. Accident Ins. Co. of Am., 134 N.J. 1, 629 A.2d 831, 848-55, 875 (1993) (refusing to enforce a literal reading of the pollution exclusion, in part because of evidence that the exclusion was intended to apply only to large-scale environmental disasters).

that it was acquiring from [its insurer] was going to exclude from its coverage situations of alleged damages resulting from the routine utilization of one of the products in the operation of its business which for some reason, on this occasion, malfunctioned." Id. at 10.

Applying Molina's holding to the allegations limned in the complaint, it follows quite naturally that Real Legacy could not refuse — as it did — to defend Acotrol. The short of it is that Acotrol has failed to meet its burden of showing that, based on a liberal reading of the complaint's allegations, a reasonable person could infer that the AI Plaza diesel spill was an environmental pollution event "as this concept is commonly understood," Molina, 166 P.R. Dec. 260 at 276 (certified translation, p. 11).

The analysis begins and ends with the complaint's allegations, from which it can be readily concluded that the overflow of diesel from the day tanks occurred inside the building. See Docket # 1 ¶ 47 ("[D]iesel fuel was permitted to escape into and through the building . . . ."); see also id. ¶ 43 ("[A]n overflow of diesel fuel from the day tanks occurred at the Subject Property, causing substantial damage to plaintiff's property . . . ."). That the diesel spill accumulated in a contained space inside the building, as opposed to the environment generally, is a robust indication that the spill was not an environmental pollution event — say, for example, groundwater contamination, see, e.g., Chico Service Station, Inc. v. Sol Puerto Rico Ltd., 633 F.3d 20, 23 (1st Cir. 2011) — "as this concept is commonly understood," Molina, 166 P.R. Dec. 260 at 276 (certified translation, p. 11).[9] Note that the complaint contains neither

_____

[9]See also Essex Ins. Co., Inc. v. Berkshire Envtl. Consultants, Inc., No. A. 99-30280, 2002 WL 226172, at * 4 (D. Mass. Feb. 7, 2002) (concluding "that the pollution exclusion does not apply because the underlying complaints do not allege that the injuries and deaths resulted from traditional environmental pollution, i.e. hazards discharged onto land, the atmosphere, or a body of water"); West Am. Ins. Co. v. Tufco Flooring East, Inc., 104 N.C.App. 312, 409 S.E.2d 692, 699 (1991) (holding that "a discharge into the environment is necessary for the [total pollution] clause to be applicable"), overruled on other grounds by Gaston Cnty. Dyeing Mach. Co. v. Northfield Ins. Co., 351 N.C. 293, 303, 524 S.E.2d 558, 565 (2000).

allegations nor insinuations that the overflow of diesel escaped the building. As Judge Posner remarked last year, "that the occurrence happens to be precipitated by a contaminant is incidental . . . ." Scottsdale Indem. Co., 673 F.3d at 719 (discussing and construing Illinois law).

To be sure, that a pollutant escapes into the environment should not automatically trigger a total pollution clause's applicability. See Auto-Owners Ins. Co. v. Potter, 105 F. App'x 484, 497 (4th Cir. 2004); cf. Scottsdale Indem. Co., 673 F.3d at 717 (providing  hypothetical case of vehicle that skids on wet surface as a result of tanker truck that spills contaminant). Under Molina, however, a pollutant's containment — even when it migrates to outside and surrounding areas — appears to be enough to deem the total pollution exclusion inapplicable. See 166 P.R. Dec. 260 at 276 (certified translation, p. 11); accord Stoney Run Co. v. Prudential-LMI Commercial Ins. Co., 47 F.3d 34, 38 (2d Cir. 1995) (holding that "the release of carbon monoxide into an apartment is not the type of environmental pollution contemplated by the pollution exclusion clause"); Meridian Mut. Ins. Co., 197 F.3d at 1184 (holding that fumes from toxic chemicals used to seal a floor at a school, which injured a teacher in the room below sealed floor, were "confined within the general area of their intended use"). So, too, here, where the complaint's allegations support the conclusion that this is a tort case against the backdrop of contamination incident, and the diesel spill was contained inside the AI Plaza's surrounding areas.  So for purposes of determining Real Legacy's duty to defend, the AI Plaza spill cannot be considered an environmental pollution event "as this concept is commonly understood," Molina, 166 P.R. Dec. 260 at 276 (certified translation, p. 11). Insofar as Acotrol espouses this interpretation, its reasoning is fully in accord with Puerto Rico's narrow interpretation of total pollution exclusions.

Real Legacy resists this conclusion. But it has, unsurprisingly, pointed to no allegations in the complaint that could remotely lead to the inference that the diesel escaped the building and contaminated  the  surrounding  environment.  And  perhaps  because  the  complaint's

allegations doom its unpersuasive position, Real Legacy instead invites the Court to look beyond the allegations in the complaint in determining whether it has a duty to defend. Citing a multitude of (mostly immaterial) exhibits, see, e.g., Docket # 425, p. 16, Real Legacy would have the Court delve into such extrinsic evidence.

But "Puerto Rico has never adopted such an approach." Jewelers Mut. Ins. Co., 410 F.3d at 16 (construing Puerto Rico law). Rather, Puerto Rico law makes clear courts are barred from looking beyond the allegations in a complaint in determining whether an insurer has a duty to defend. See id.; accord, e.g., Travelers Cas. & Sur. Co. v. Providence Washington Ins. Co., Inc., 685 F.3d 22, 34 (1st Cir. 2012) ("The duty to defend question before us, however, begins and ends with the Rhode Island pleadings test."). See also 14 Couch on Insurance § 200:19 (3d. ed. updated June 2013). Because Real Legacy's misguided invitation would lead the Court into error, it is declined.

Undeterred, Real Legacy appears to argue that, because the diesel spill was an "environmental emergency" as defined by a Puerto Rico statute, the total pollution clause must apply. See Docket # 425, p. 9 (citing P.R. Laws Ann. tit. 12, § 8004a(1)).[10] But this argument is a red herring. Even assuming for argument's sake that Real Legacy is right, the fact that an occurrence falls under the definition of "environmental emergency" does not mean that the incident is an environmental pollution event "as this concept is commonly understood," Molina,

---

[10] This statute defines an environmental emergency as

any discharge or threat of discharge, accidental or unauthorized intentional leakage, seepage, pumping, injection, dumping, emission or disposal, or any situation caused by spilling or leaving a pollutant or a hazardous or low-level radioactive substance or waste or hydrocarbons or their byproducts in or on any piece of land or any superficial or underground body of water or out or dispersed into the air or so as to gain access to any paved area or any area covered in asphalt, concrete, tar, or any kind of man-made material that poses a risk or a threat of risk for public health and safety, the general welfare or the environment.

166 P.R. Dec. 260 at 276 (certified translation, p. 11). After all, the pollutants in Molina —

hydrochloric acid and sodium hypochlorite — were no doubt  considered an "environmental

emergency" under this section; they contaminated the water and poisoned people. See id. at 262-

63 (certified translation, p. 4); see note 10 above. Yet, the Puerto Rico Supreme Court deemed

the total pollution clause inapplicable. This ends this aspect of the matter.

The Court need not spill more ink on this matter.[11] Real Legacy has fallen short of

meeting its burden of persuading that "the pleadings clearly show that the damages claimed"

are barred by the total pollution exclusion. Quiñones López, 1996 P.R.-Eng. 499, 244, 141 P.R.

Dec. at 165 n. 27 (emphasis added). And its reliance on non-binding cases from other

jurisdictions, the majority of which are plainly distinguishable, is misplaced.

It follows, without question, that under Puerto Rico law, Real Legacy had the duty to

defend Acotrol. But because it impermissibly withdrew legal representation, Real Legacy

violated this duty and therefore breached the insurance contract. See, e.g., González v. The

Commonwealth Ins. Co., 1996 P.R.-Eng. 499, 056, 140 P.R. Dec. 673, 682-83 (1996) ("The

cause of action for breach of the contractual obligation to assume legal representation of an

insured has been broadly discussed and accepted in our jurisdiction." (collecting Puerto Rico

case law)). Inasmuch as Real Legacy breached its duty to defend Acotrol, the latter "is entitled

to costs and attorneys fees." Municipality of San Juan v. Great Am. Ins. Co., 813 F.2d 520, 521

(1st Cir. 1987); see, e.g., Figueroa v. Excellere Consulting Associates, Inc., No. 10-1353, 2013

WL 5522298, at *5 (D.P.R. Sept. 30, 2013).  "In addition, in most cases, 'the insured will have

the right to recover the amount paid to the third party to whom the damage was caused (of

---

[11]Accordingly, there is no need to discuss the applicability vel non of the so-called reasonable expectations doctrine, which, under Molina, would appear to provide Acotrol with an independent ground against the total pollution exclusion's applicability. See 166 P.R. Dec. 260 at 276 (certified translation, p. 11).

course, within the coverage limits of the policy).'" Id. (citing PFZ Props., Inc. v. Gen. Acc. Ins. Co., 136 P.R. Dec. 881, 897 (1994)).

So Acotrol is entitled to a declaration that Real Legacy violated its duty to defend it in the underlying action. Acotrol is also entitled to a declaration that, in violating this duty, Real Legacy breached its contractual obligations. Accordingly, Acotrol's summary-judgment request on these points is **GRANTED**, while Real Legacy's is **DENIED**.

II.    *Duty to Indemnify*

Summary-judgment resolution of Real Legacy's obligations to pay any (potentially adjudged) damages against Acotrol — that is, the duty to indemnify or to provide "insurance coverage under the policy," Scottsdale Ins. Co. v. Subscription Plus, Inc., 299 F.3d 618, 623 (7th Cir. 2002) (Posner, J.) — presents a more difficult question. That is so because both parties have neglected to discuss the crucial differences between an insurer's duty to indemnify viz. its duty to defend. Acotrol conveniently conflates both duties, see Docket # 340, p. 13 (incorrectly stating that the duty "to extend coverage . . . [is] determined . . . by the allegations in the Complaint"),  while Real Legacy discusses neither one. Refusing to bite the bullet, the Court declines to follow Acotrol's erroneous approach. See Travelers Ins. Co. v. Waltham Indus. Labs. Corp., 883 F.2d 1092, 1100 (1st Cir. 1989) (faulting party for fail[ing] to distinguish between the duty to defend and the duty to indemnify"); In re San Juan Dupont Plaza Hotel Fire Litig., 45 F.3d 564, 569 (1st Cir. 1995) (remanding because of court's failure to "discuss the asserted distinctions between the duty to indemnify and a duty to defend").

Generally speaking, it is common ground in this circuit (and in most jurisdictions) that "the duty to indemnify is triggered only 'when a judgment within the policy coverage is rendered against [the] insured.'" Great Am. Ins. Co. v. Riso, Inc., 479 F.3d 158, 160 (1st Cir. 2007) (construing Massachusetts law); Travelers Ins. Co., 883 F.2d at 1099 (applying Maine law and holding that "an insurer's obligation to defend is measured by the allegations of the

underlying complaint while the duty to indemnify is determined by the facts, which are usually established at trial"). And it appears that Puerto Rico is in accord. See Pagán Caraballo, 22 P.R. Offic. Trans. 96 at 102 (finding that "the duty to defend is ampler than the duty to compensate; it is independent from the outcome of the suit and from the imposition of liability finally made by the court") (citations omitted); Metlife Capital Corp. v. Westchester Fire Ins. Co., 224 F. Supp. 2d 374, 387 (D.P.R. 2002). Tersely put, the duty to indemnify is controlled by the established facts. Am. Econ. Ins. Co. v. Jackson, 476 F.3d 620, 625 (8th Cir. 2007).

In this case, Acotrol's duty to indemnify has not been triggered; this duty "arises only when the claim against the insured has enough merit to produce a judgment for the claimant, or a settlement." Scottsdale Ins. Co., 299 F.3d at 620; but cf. VRV Dev. L.P. v. Mid-Continent Cas. Co., 630 F.3d 451, 459 (5th Cir. 2011) ("The duty to indemnify may be resolved at summary judgment, however, when the insurer has no duty to defend and the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify." (citation and internal quotation marks omitted)).[12] Neither event has occurred. Acotrol's liability has been proven  neither at trial nor via summary judgment. Nor has Acotrol decided to settle the underlying case. Whether or not Real Legacy has a duty to indemnify Acotrol, therefore, is not ripe for adjudication. See  Trice, Geary & Myers, LLC v. Camico Mut. Ins. Co., 459 F. App'x 266, 277 (4th Cir. 2011) ("[A] declaration as to CAMICO Insurance's duty of indemnification would be premature at this time; such a declaration should instead be made after the underlying actions are resolved." (citation omitted)); see also Premcor USA, Inc. v. Am. Home Assurance Co., 400 F.3d 523, 530 (7th Cir. 2005).

----

[12] Accord Cravens v. Smith, 610 F.3d 1019, 1028 (8th Cir. 2010) ("The trial court cannot know what the facts will be or whether those facts will fall within the policy coverage until those facts are established at trial."(citation and internal quotation marks omitted); United Fire & Cas. Co. v. Boulder Plaza Residential, LLC, 633 F.3d 951, 962 (10th Cir. 2011) (similar).

So once Acotrol's duty to indemnify arises, the parties may refile, if necessary, cross-motions for summary judgment on this issue. See Westport Ins. Corp. v. VN Hotel Grp., LLC, 513 F. App'x 927, 930 (11th Cir. 2013) (per curiam). Real Legacy, however, should seriously consider the risks of going forward with its no-coverage argument. Cf. note 3 above. Acotrol and Real Legacy's summary-judgment motions are **DENIED** on this point.

### III.  Rule 56(d) Request for Discovery

As noted above, Real Legacy filed a motion under Federal Rule of Civil 56(d), requesting that Acotrol's motion for summary judgment be held "in abeyance until the limited discovery sought out is completed." Docket # 382, p. 10. Acotrol duly opposed. Docket # 395.

Federal Rule of Civil Procedure 56(d), formerly Rule 56(f), provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition [to a motion for summary jugment], the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." See Harrington v. Aggregate Indus. Ne. Region, Inc., 668 F.3d 25, 29 n. 3 (1st Cir. 2012).[13]  This rule "offers a procedural escape hatch for a party who genuinely requires additional time to marshal facts essential to justify [its] opposition . . . ." Mattoon v. City of Pittsfield, 980 F.2d 1, 7 (1st Cir. 1992) (citation and internal quotation marks omitted; brackets in original). A party seeking a Rule 56(d) deferral must therefore "set forth a plausible basis for believing that specified facts, susceptible of collection within a reasonable time frame, probably exist and indicate how the emergent facts, if adduced, will influence the outcome of the pending summary judgment motion." C.B.

---

[13] "[C]ase law developed under former Rule 56(f) remains controlling . . . ." Nieves-Romero v. United States, 715 F.3d 375, 381 n. 3 (1st Cir. 2013) (citing Jones v. Secord, 684 F.3d 1, 5 n. 2 (1st Cir. 2012)).

Trucking, Inc. v. Waste Mgmt., Inc., 137 F.3d 41, 44 (1st Cir.1998); Price v. General Motors Corp., 931 F.2d 162, 164 (1st Cir.1991).

Conceding that it "has over 12,000 pages of documents relating to the investigation and the discovery done by the parties in the present case," Real Legacy nonetheless argues that "it appears that no depositions w[ ]ere taken from the entities involved in either the cleanup or from the investigation conducted by the Environmental Quality Board." Docket # 382, p. 9. Such depositions, the argument goes, are "needed" to properly file its cross-motion for summary judgment. Id. This request is not only without merit, but it also lends a certain air of unreality to the situation. Several reasons support this determination.

First, Real Legacy "cite[d] no caselaw at all" in support of its Rule 56(d) request. Machado v. Shinseki, 700 F.3d 48, 49 (1st Cir.2012) (per curiam). That omission suffices to deem the request waived. See, e.g., CMM Cable Rep, Inc. v. Ocean Coast Props., Inc., 97 F.3d 1504, 1525-26 (1st Cir.1996) (three sentences with three undiscussed citations did not defeat waiver). Second, Real Legacy's supposed "need" to take the depositions is belied by its own statement that the "12,000 pages of documents" under its control "will demonstrate that spill was the environmental incident excluded from the Policy." Docket # 382, p. 9. Such a contradiction, logic dictates, means that Real Legacy "can[ ] present facts essential to justify its opposition [to a motion for summary judgment]." Fed. R. Civ. P. 56(d) (emphasis added). Third, Real Legacy's speculative and conclusory assertions that such depositions are "needed" are wholly unpersuasive; they neglect to "indicate how the emergent facts, if adduced, will influence the outcome of the pending summary judgment motion." C.B. Trucking, Inc., 137 F.3d at 44 (emphasis added and citation omitted).

Finally, and as correctly noted by Acotrol, see Docket # 395, pp. 13-14, Real Legacy's request to conduct discovery refutes its asseveration — as per its December 19, 2012 letter to Acotrol (Docket # 342-4) — that it conducted an "investigation" before denying coverage and

impermissibly withdrawing Acotrol's legal representation. It follows that Real Legacy, as an insurer involved in this litigation for more than three years, was not diligent in pursuing discovery when it had to, i.e., before jumping the gun and withdrawing legal representation. See note 3 above and accompanying text. Real Legacy cannot have its cake and eat it too. Its Rule 56(d)  request is **DENIED**.

> *IV.     Other Issues*

There is one loose end. While Real Legacy also mentioned the so-called professional liability exclusion as an affirmative defense in its answer to Acotrol's third-party complaint, see Docket # 380, p. 6, it has since forfeited and waived this defense. That is so because Real Legacy has failed to pursue this defense. Following its answer, Real Legacy never developed this defense (not even an argument in passing); it was not even mentioned in its pretrial brief, see Docket # 446; and its motion for summary judgment mounts no defense whatsoever to Acotrol's persuasive contention regarding the patent inapplicability of this exclusion. Under this circuit's well-established "raise-or-waive rule," Real Legacy's abandonment of the defense is tantamount to waiver, Rocafort v. IBM Corp., 334 F.3d 115, 121 (1st Cir.2003); Amcel Corp. v. Int'l Executive Sales, Inc., 170 F.3d 32, 35 (1st Cir. 1999). Moreover, by failing to even mention the professional liability exclusion in its only reservation-of-rights letter, see note 2 above and accompanying text, Real Legacy waived its right to assert this defense, which was first alluded to over four years thereafter. See Sosebee v. Steadfast Ins. Co., 701 F.3d 1012, 1020 (5th Cir. 2012); Transamerica Ins. Grp. v. Beem, 652 F.2d 663, 666 (6th Cir. 1981).

In all events, because Acotrol is clearly entitled to a declaration that the professional liability exclusion is inapplicable, its summary-judgment motion, whose statement of uncontested facts on this front was deemed admitted, see Dockets # 417, 418, is **GRANTED** on this point.

**CIVIL NO. 09-1111 (SEC)**                                          **Page 21**

**Conclusion**

For the reasons stated, Real Legacy's motion for summary judgment and its motion under Rule 56(d) are **DENIED**. Acotrol's summary-judgment motion is **GRANTED in part and DENIED in part**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 9th day of December, 2013.


                                        *S/ Salvador E. Casellas*
                                        SALVADOR E. CASELLAS
                                        U.S. Senior District Judge